and perhaps someone will tell me when we're ready to go. Thank you, Your Honor. Good morning, Your Honors. I'll just call the case. I'm sorry. 141437 Life Plans Incorporated v. Security Life of Denver Insurance. Good morning, Mr. Novak. Good morning, Your Honor. May it please the Court. Your Honors, the District Court entered summary judgment on both counts 1 and 2 based solely on its conclusion that SLD had the absolute right to terminate the contract at any time, even within the first three years of the contract. Yet, when all relevant provisions of the contract are given effect, it is clear that this decision was wrong. Well, let me start you off because here's what I've been wondering. How can Section 1, lowercase a, provide a minimum term of three years when the entire deal is contingent on the conditions that were set forth in Section 2B? Because it seems a bit odd to say that this contract will go on for a minimum of three years when the parties have acknowledged it may not go forward at all. Well, Your Honor, the conditions in Section 2B actually go to the obligation of SLD to offer the policy. It's not a condition to the contract. The contract, therefore, can have the three-year minimum term, and it did. It had a three-year minimum term, and under that term, the SLD was obligated to issue the policy if the conditions were satisfied. I can argue, and I will later, that the conditions were satisfied, or at the very least, there's issues of fact precluding summary judgment on that issue. And the District Court didn't even reach the issue. But the point is that 1A gives a minimum three-year term, and Section 8I says that after that, the contract continues indefinitely, subject to at-will termination. Both parties agree that Section 1A sets the initial three-year commitment. It's also undisputed that Section 8I does not state that the contract can be terminated at any time. Rather, it provides that the agreement, quote, will continue, will continue, my emphasis added, until terminated. Now, nevertheless, SLD argues that Section 8I is only a termination provision, and accordingly, it trumps Section 1A's three-year term. But that's not right, and that's because Section 8I does not just provide for termination. It also says, that emphasized words I said before, the agreement will continue. The will continue has to be given meaning. Delaware law requires that all contractual provisions be given meaning, and it also requires that seemingly inconsistent provisions be harmonized significantly. Mr. Novak, you've offered one way to harmonize. If I understand your position, you've got, if the conditions preceding are met, you've got a three-year minimum term, and then terminable at will. If we don't agree that that's the only way to harmonize them, then we would look at parole evidence, right? That's correct. If there are two plausible ways to read this, that would make it ambiguous, and under Delaware law, then you look to extrinsic evidence. Okay. And could you explain to us how you get to the result you like based on parole evidence here, the extrinsic evidence? Well, the result we're trying to get to is, of course, a reversal of summary judgment. We're not asking this Court to find that that extrinsic evidence overwhelmingly supports us or that there's no issue of fact. But there is actually, Your Honor, a mountain of evidence that supports our interpretation as to the intent of the parties. And the most important evidence in this regard is, how did the parties themselves interpret the contract before there was a dispute? That's really the best way to look at the evidence. And in that regard, only a day or so after the contract was signed, we have the evidence that the lawyer who drafted the contract for SLD, Mr. Jenkins, told David Simon, one of LPI's principals, in a phone conversation, that SLD had no right to terminate before fulfilling a three-year, $300 million commitment. Where is that written? Pardon? Is that written somewhere? No. That's from a telephone conversation. But it's in the affidavit of David Simon, which this Court needs to accept for purposes of summary judgment and give all inferences in LPI's favor. And in addition to that, Judge, there was another statement by an SLD senior executive, this time Scott Carney, and this one was in writing. In an internal email, he wrote that SLD expected to write the full $300 million of premiums. And only after that, only after that, would SLD then review the product again and decide if it wished to continue to write more business. And then perhaps the clincher here, Your Honors, is that in July of 2011, and now we're only one month, only one month into the contract, SLD asked for, it didn't get it, but it asked for an amendment that would have reduced the initial term from three to one year and would have made two, I'm sorry, years two and three expressly subject to termination under Section 8I. Now, if SLD believed that it already had the right to terminate this contract immediately and for no reason, it surely would not have asked for an amendment that took away that right unless that right didn't exist. And that's why they asked for that amendment. And fourth, Your Honors, consistent with this, consistent with the party's intent, when SLD purported to terminate the contract, it relied on the contention that the policy approval condition proceeding had not occurred. It did not rely on Section 8I's so-called absolute right to terminate. Now, the termination letter did mention Section 8I, and it did so in one sentence toward the end of the letter. But it didn't say that it had the absolute right to terminate. Instead, it spent a lengthy preceding paragraph explaining why it was that it believed Section 2D-2 wasn't satisfied. It would not have gone to those lengths. Certainly, you can't say this on summary judgment. It would not have gone to those lengths if it believed it already had the right to terminate at any time and for no reason. And consistent with... Was that just a mistake? Pardon? Was that the 30-day notice by either? Is that just a mistake in the contract? I'm sure that if we get to trial that they'll argue that. But this court looks to see if there's an issue of fact. And the fact that they sent that letter to terminate, and instead of relying on 8I's supposed absolute right, they had to justify it through the 2B-2, shows that the intent of the parties at the time, coincident with this contract only four months after the contract, the parties themselves, SLD's own attorney, didn't believe that that right existed. You know, the contract requires as one of six conditions precedent that the policy be submitted and approved under the company's product review and approval process. But the contract doesn't define that process, or does it? It does not. But what it does do is it says that the policy must be approved by SLD's process. But if it doesn't define that process, why wouldn't that allow the company to use whatever process it wishes to use? It seems to place unfettered discretion in the company's hands, and that would leave very little room for LifePlan to complain if the policy doesn't pass the review process. Well, whatever right we could theoretically debate on, this gave to SLD. It actually went through that designated approval process and ended up approving, or at least we have evidence to prove that the approval was actually given. That approval went through the contract approval review process, which included the actuarial department's approval, the legal department's approval. We have the evidence that SLD submitted this plan, this policy, for approval to over 50 regulatory jurisdictions to the regulators and stated that it will, quote, will issue this product. So maybe they theoretically had discretion. I disagree with that, but let's just assume it. They didn't exercise it. They actually approved this policy. There at least was an obligation of good faith and fair dealing with respect to that process, right? Well, absolutely. If we could back up for a second. I'm curious about is there any difference that we ought to worry about between the contract's PRAP reference and the other PARP references we see? Is it a typo? Are they different? Are they the same? According to SLD, they are different. In fact, one of them is a process that ING, the parent, not a contracting party, performs. The other is the process that SLD, our contracting party, performs. Which is which? SLD is the subsidiary and the contracting party, the insurer. No, no, I got that. Which one does? PRAP is SLD's, product review and approval process. PARP is ING's, product approval and review procedure. Okay. But Your Honor asked if there's any reason to worry about that. I would say this. On this summary judgment record, no. Remember, the court entered summary judgment solely on. Right. The court didn't reach this mess of an issue. Right. And a mess. Let me ask. This is the issue where we've got Britton testifying that he signed the pricing memorandum, right? Correct. He's SLD's CEO. He is. Was, anyway. Where does the pricing memorandum fit into either of these processes? That, as I understand it, Your Honor, and the record shows, fits into what SLD is calling ING's PARP process. The parent's PARP process. So that even if PARP was the governing process, there is evidence in the record creating at the very least an issue of fact that it, too, was satisfied. Because Mr. Carney, an SLD person, testified that Mr. Lyle's memorandum constituted approval under PARP subject to three conditions. Those three conditions were satisfied. And as a result, Mr. Britton then signed both on the same day, both the JCA, the contracted issue, and that pricing memorandum, signifying that those conditions had been satisfied. So even if PARP is the governing process and we don't agree with that, there's evidence, substantial evidence, creating issues of fact that it was satisfied. I mean, on this issue, Judge, you called it a… That's the one where there's no document. But you don't have the signed document. We don't have the signed document, but we have his sworn testimony that he signed it. And the fact that they didn't produce it shouldn't prejudice us. We should be able to say to the jury, their CEO testified that he signed it. They didn't produce it. The inference should be drawn that it was signed. And, Judge, you sort of called it, I'm sure colloquially, a mess. And I would say that instead of saying mess, there are issues of fact on that issue. I can't see how anyone could read this record on the issue of whether 2B2 was satisfied and could say that there are no issues of fact. Certainly the district judge didn't say it. And there's all kinds of evidence going both ways. SLDs… I think one reason that Judge Hamilton called it a mess is because when you read the briefs, it's as if the parties are working from different records. So I think that, you know, maybe, I mean, I think you might even agree with that. Well, there's certainly a difference of opinion, and I apologize if that's the way it came out. But we cited to the record. I should also add, Mr. Novak, you've cited record evidence that's part of the record on summary judgment. I should say that in the years I spent on the district court, I loved trying messes. Well, we should let the jury try this case. A couple of housekeeping matters, Mr. Novak. A number of these documents seem to still be under seal that are in the record now. Why is that? Do they still need to be? I believe they do. They're trade secrets concerning LPI plaintiffs' trade secrets on creating this ALPS program. We did make a motion to keep them under seal, and I believe that was granted. Obviously, the court has access to the unredacted matters. Give me a hint, at least. What do we need to worry about in terms of secrets, however this opinion gets written? Well, there's an element to this program that's unique, that the plaintiff believes is very unique. I hesitate to say it because then telling you what it is, saying on the record, I think Your Honor will be able to find it. We may not need to dig into the record on that. Right, and I believe Your Honor will be able to find it pretty easily. If I could also ask you about this issue about amending the complaint. If I understand this correctly, you filed your motion about 10 days after a particular deposition related to ING. Is that right? That's correct, Judge. What was the revelation that you think tipped the balance with respect to ING, prompting that? That ING actually directed SLD to reject this policy after there had been an approval recommendation made. And was that something you had suspected before, or what was the change there? I imagine there was some suspicion about that, but we didn't want to file a suit against ING without having confirmation, which we got. Judge, I think the most important part about that motion to amend, if I may, because given the fact that we filed a second suit that is still pending before Judge Zagel, amendment is not that critical. But the most important part about the amendment process was how Judge Guzman handled it. Judge Guzman went to a ruling on that without even reading the motion, didn't know it was up for consideration, chastised the plaintiff for getting extensions on discovery when the record is absolutely clear, and no one has ever said otherwise, that it was the defendant that got the extension of the discovery cutoff. It was the defendant who was delaying the depositions. The plaintiff had to move to compel discovery, and frankly, this process coupled with the summary judgment motion, ruling I should say, signals to us at least an impatience, if I can be gentle about it, by the district court with the plaintiff or with plaintiff's counsel or both. And we would respectfully ask if the court reverses, which we urge the court to do, and implement Rule 36. The judge, looking at that, what he said, that he's very frustrated with the, I guess, I don't want to put an adjective on it, but some kind of delay that went through the process and then last minute depositions and trying to bring in new parties and that sort of thing. He just says, no way. Now, that's why I'm interested in Judge Hamilton, who did this for 15 years. Is this too abrupt? Is it too overriding, or is it something that we defer to his discretion since he's been there and watched this whole process develop? Well, we represented we would take no more depositions. The defendant had not yet taken any of our depositions, so nothing had to be redone. In the Zagel case, and it's a matter of public record, the argument was that the suit against ING was the identical suit. It's already in the record, and they got a res judicata finding on the basis of it. It couldn't have changed anything. No more trips to Amsterdam or wherever. Pardon? No more trips overseas. No, there wouldn't be any. You know, I had a question about the leave to amend because you stated on page 16 of the opening brief that the defendant had not yet answered the complaint when life plan moved to amend. If the defendant had not answered, why did life plan ask for leave to amend? Rule 15A1 allows the party to amend without asking for leave if there's not been a responsive pleading. Judge, I'm sorry that I have no answer for that. That's perhaps what should have been done, but I think that also goes to the fact that there's an abuse of discretion in not allowing an amendment that we could have gotten as an automatic right. Was there a case management plan in effect that established any deadline for amending pleadings? I don't believe so. There was a discovery cutoff that hadn't yet passed, hadn't yet come. There was no trial setting. Judge, it looks like my light has turned off, and I hope I'll get a chance to do some modest rebuttal. I beg your indulgence for that. Absolutely. We peppered you. Well, thank you. Thank you both for peppering me and for giving me more time to come back. Thank you, Mr. Novak. And if there's a Mr. Garvey in the courtroom, will he please come up? Good morning, Your Honor, Counsel. May it please the Court. My name is Jim Garvey, and I represent Security Life of Denver Insurance Company. Hi, Mr. Garvey. Good morning, Your Honor. I'll refer to it as SLD for ease of reference and LPI, as I think we did in our briefs. I would like to begin my remarks where the district court ended, which is I think the first question that this panel has to ask is, based upon the first questions that the panel asked of opposing counsel, how does the panel, like Judge Guzman did in the district court, harmoniously read Section 1I of the JCA with Section 8I? And we think that based upon the plain language of the agreement and the ordinary meaning of the terms in that agreement, that the district court got it exactly right. As a first matter, Section 1A itself says, before talking about a three-year, $100 million commitment, that the terms of this joint cooperation agreement will govern the commitments. One of the terms of the agreement, of course, is Section 8I. The now therefore clause also refers to all terms of the agreement. So we would submit that it's LPI who is asking the panel, like it asked the lower court, to read Section 1A in isolation of Section 8I. Section 8I does say that the contract shall continue indefinitely. However, the definition of the term indefinitely is not certain in amount or length from Webster's Dictionary. That's what the term means. So there was no certain length for this contract. And I would note, too, that Section 8I of the JCA not only gave SLD a right of termination at any time, but it gave LPI a right of termination as well. And if you accept LPI's construction of this agreement, then LPI could have terminated the agreement on 30 days' notice, and SLD would owe it commissions on up to $300 million of premium for policies that had never been written. Is that in your brief? That argument in our brief? Yeah. I don't believe so, Judge. That's a remarkable assertion that I don't think the plaintiff has made. How do you get that? That's preposterous. But that's the result that they're asking for under their construction. I don't understand that at all. Well, because they're asking, Your Honor, that they be paid. I think the record evidence shows that they're seeking $40 million in commission payments based upon a peak policy or policies that were never issued and $300 million of premium that was never received by Security Life of Denver Insurance Company. What were the 100 applications that they're talking about? The undisputed record evidence is that there were applications submitted by LPI to SLD that did not specifically reference the peak policy, which is the name of the policy that was called for under the JCA. Rather, they identified actual policies of SLD that were available. Isn't there also testimony, however, that that's the way the paperwork was handled by agreement so that it could be processed quickly? Is there evidence, testimony to that effect? The testimony was that the parties agreed that applications for policies would come in under products other than peak, and I think this goes to support the fact that everybody knew in LPI's own record show, Ms. Simon, another principal of LPI, her record show that even as of the timing of the signing of the JCA, the process had not been completed. So the understanding was applications would come in, would identify products other than peak, and if peak became available, they would be considered for the peak product. The undisputed record evidence also is that one application in this post-JCA signing period, pre-termination, identified peak, and SLD immediately rejected it because peak was not available. Tell me this. What does the continue indefinitely language mean under your reading of the contract? Continue suggests that there is some period of time to begin with, and then the contract continues. But it seems that under your readings, the defendants could sign the contract on Tuesday and give the 30-day termination notice on Wednesday. Is that right? That is what the contract provides, Your Honor, and LPI could have done the same thing. And here are the protections that LPI was afforded under Section 8i. This is what the parties negotiated for. One, a 30-day notice, so that in that 30-day period from the point in time when it received notice, the parties are performing during that 30-day period. In addition, and as important, SLD had an obligation to process applications that were received prior to the notice, the receipt of notice of that termination. So the party's understanding was that applications could start coming in once the product was approved, but either side could terminate. Upon 30-days notice, and with regard to applications that were made for this product, SLD would process those applications, and if applicants were qualified for the peak insurance product, then a policy would issue. Your Honor asked a question of opposing counsel in terms of extrinsic evidence and what the extrinsic evidence would show as to what the party's intent was. I would suggest that we have a profound disagreement with counsel's statements about what Mr. Simon said or Mr. Jenkins said, but the Court need not look any further than LPI's first draft of a joint cooperation agreement, which draft SLD rejected. That first draft of the joint cooperation agreement stated the following. The term of this agreement shall be for an indefinite period. What shall not be terminated prior to the fulfillment of SLD's 300 million ALPS premium commitment? After the fulfillment of 300 million ALPS premium commitment, either party hereto may terminate. This was LPI's first draft of this agreement, and it was rejected by SLD. Okay, so if we get to extrinsic evidence, you've each got some good stuff, right? Well, I don't believe that they have any good stuff. What do you make of your proposal about the one year? I'm sorry? What about your party's proposal for the one year? Yes, so respectfully, opposing counsel, I believe, mischaracterized the record. The testimony was that after the JCA was executed, Pamela Simon of LPI contacted Gary Jenkins, the in-house lawyer for SLD, having realized that SLD or LPI could terminate the contract at any time. In order to address Ms. Simon's concern, Mr. Jenkins offered that SLD would lock in, would lock in to 100 million of premium, given that there was no obligation to do so. So he offered that as a point of compromise. LPI rejected that proposal, and therefore the contract stood according to its plain terms, terminable by either side. Mr. Garvey, I was a little startled by your initial argument about how to interpret 1A, and I was looking for that in your brief about how to reconcile these, and I didn't see it. You rely on 8I. Right. But I didn't see this point about the terms will govern, and that's how we reconcile 1A and 8I. I believe you. I'm sorry. The reason I'm asking about that is because, in essence, if I read only 8I, then it seems to me you're obviously right. But if I read 1A by itself, then the plaintiff is obviously right. And I had been looking in your brief for a way to reconcile those two, and I didn't see it. Then you lead with it in your oral argument. And the reason I led with it in the oral argument, Your Honor, is based upon the reply brief where there's such a focus on an argument that, in effect, we would submit they're saying that 1A gets to be read in isolation as if 8I was not in the contract. They're asking the court to act as if 8I is not in the contract, in particular given their first proposal with regard to this JCA, which they acknowledge. It's undisputed in the record, was rejected by SLD. What I didn't understand about the district court statement that interpreting sections 1A and 8I together to grant a three-year term followed by a right to terminate, when the district court said that that would render the termination provision illusory because that's a very common contract provision, you know, to have an initial set term and then allow the agreement to continue under the same term until someone terminates. How would that be illusory? Well, I think you would be reading out of Section 8I the word indefinitely. So while LPI suggests to the panel or to the court that this is a contract for a three-year term, the language of 8I belies that argument. It says the JCA will continue indefinitely, which by definition means not a certain term. What's wrong with the interpretation of just saying, look, these two paragraphs are simply at odds with one another? You can't reconcile that just within the four corners of the document in a reasonable and certain way. So go to the extrinsic evidence and allow a jury to hear that. Well, because I think you don't just consider Sections 1A and 8I, but also all of the other provisions of the JCA, such as Section 2B, which sets forth conditions precedent. Yeah, but those are objective. They don't give you a right at will to terminate. Those sections excuse performance if, at least in the case of 2B, there has been a failure of a condition precedent. That's a separate issue. Sure. But I think reading the contract as a whole, it's actually part of the same issue. Virtually any contract can be terminated for cause if there's a material breach, right? If there's a breach of the contract, one side's performance is excused. Or a failure of a condition precedent. That's right, in this case with regard to 2B. But in light of the record evidence here, we, of course, respectfully submit that these provisions are perfectly reconcilable. And this is what the parties agreed to. They agreed to, having rejected other language that would have given LPI what it wanted, precisely what ended up happening here, which is in the case of SLD, a right of termination. Now, to address counsel's point about the termination letter, which did cite 8I, which is the termination provision of the contract, also noting that the product had not passed PARP review, I think they argue, LPI argues in its brief, that this was some adoption of a standard of termination for cause. But it was not at all. The fact was that this product did not receive PARP approval. And we would submit as an alternative grounds for summary judgment, in addition to the four or five more grounds that we have cited in our brief and that are supported by the record, simply noting in a letter that we are terminating and advising that the product had not passed PARP approval doesn't impose an additional term of cause for termination in the contract or upon the terminating party. I think you probably are coming toward the end of your time. No lights are on, Judge Roberts. Oh, great. I do want to ask this. I want to ask about that motion to amend. Because, of course, Life Plan says that you have not yet answered the complaint when it asked to amend. Is that true? That is true, Your Honor. At the time that the motion for leave to amend was filed, SLD had a motion to dismiss pending pursuant to Rule 12b-6, and that motion had not yet been ruled upon as of that point in time. LPI did not argue a right of leave to appeal as of right. The issue was not raised by us or by Judge Guzman. I would say, though, that under the abusive discretion standard and the fact that amendment would have been futile, this really becomes no issue at all. Why would amendment have been futile? Well, because LPI was proposing to sue INGUS, which is SLD's parent company, for tortious interference with the JCA, one element of which is an underlying breach of contract by the contracting party. And for the same reason that the claim against SLD failed, we submit that the claim against INGUS would have failed too. Suppose we disagree with the district court about that, however. Then it wouldn't seem so futile. Right. Okay. Yeah. Okay. Can I ask you a little bit about the choice of law point here? Sure. In your brief at 39, you make an extraordinary suggestion that if the condition precedent wasn't satisfied, then we should apply Illinois law on the theory that the contract never took effect. Yes. What law, under your theory, would govern our decision about whether the condition precedent was satisfied? Delaware law. Okay. As set forth in the JCA. You would concede that much? Yes. Okay. And that would include good faith, fair dealing, and so on, right? Well, so there's a distinction in the law I would submit between validity and enforceability of a contract. And the validity of this contract is tested under Delaware law, but if the condition precedent failed and no obligations, any of them, any of the six, they were separate conditions precedent. If any one of those six failed, there's effectively no contract, and I think the case would default to Illinois law and a most significant context test to determine whether the applied covenant should apply. How do you say there's no contract? I mean, if you're talking about the legality of a contract, I understand it. If you're talking about whether consent was coerced or whether a signature was forged, I understand that. But the couple of district court cases you cited for this rather extraordinary proposition are actually quite narrow, and one of them doesn't even deal with a real disagreement. And I was wondering if you wanted to comment on, I think it's called, the case the plaintiffs talked about, a case of ours, in their reply brief. Your Honor, I apologize for that. If you pick the law in the contract under Illinois law, we ordinarily will enforce that choice of law with respect to all questions except the validity of the formation of the contract. I think at the end of the day, whether Delaware law applies to the implied covenant claim or to the contract claim or Illinois law applies, there's no different result. Under Illinois law, there's not an independent cause of action for the implied covenant. Under Delaware law, the plaintiff would have the burden of showing fraud, deceit, or misrepresentation, of which there's no record evidence in this case. And I don't even think there's a suggestion by the plaintiff, LPI, that there was any fraud or deceit or misrepresentation. There seems to be at least some evidence from your own people to the effect that you hadn't been dealing fairly with the plaintiff. And that testimony by Mr. Britton, or the statement by Mr. Britton, in a presentation to the ING Office of the CEO you saw referenced in the papers, he explained that his deposition was merely a comment by him that he had known the Simons, who are the principals of LPI, for a long time. And Mr. Britton clearly was advocating for the acceptance of the peak product within the SLD family of insurance product offerings. He was the product's biggest proponent. So are we required to accept his deposition explanation? Well, I think when there's no contrary evidence, yes. Reasonable inference? You couldn't draw an inference from the statement that you hadn't been dealing fairly with the Simons? Not in isolation. It has to be taken in the context of the undisputed record evidence that Mr. Britton was the product's biggest proponent from the get-go. What do we do with the testimony that Britton had signed the pricing memorandum? So he testified at his deposition that he signed the memorandum following, and there is no version of the pricing memorandum that is signed by Mr. Britton or anyone else. After his deposition, LPI's counsel asked that a signed copy be produced. We confirmed for counsel that none exists and that Mr. Britton was mistaken in his testimony. So why is that not a genuine issue of fact? Well, it doesn't matter because Mr. Britton's signature is not the only signature that's required on the pricing memorandum. The pricing memorandum has places for not only Mr. Britton's signature but also Mr. Lau's signature and Mr. Schimppi's signature. Ultimately, a product, a new product becomes approved or a product that's being renewed becomes approved for renewal only upon the approval of the Enterprise Risk Management Team. That's a team. That's an ING team? No, it's an SLD team. Mr. Schimppi is an officer of SLD. He also had a title. Britton's the CEO, right? Mr. Britton was the president of SLD. Mr. Schimppi is a vice president of SLD and an executive of ING US as well. So are you telling us that the president's signature was not sufficient? That's correct. He needed to have his subordinate's sign as well? No, no, not at all. The signature of the president of SLD is not sufficient because he does not get to decide what products become issued. The Enterprise Risk Management Team of ING US, which has people within SLD as well, Mr. Lau, and then Mr. Schimppi above him, who has positions with both ING US and SLD, Mr. Schimppi has the final say. He's the top risk officer of ING US. Does the president of SLD have apparent authority to sign such a contract? No. Why not? Well, in this case, because the JCA says that product review and approval under PARP is required. And that's not Mr. Britton. The acronym, it's capital P-R-A-P in the JCA. But the undisputed testimony was, and opposing counsel respectfully miscited the record, every witness of SLD and ING testified that there's only one process. It's a product review and approval process. And whether you call it PRAP or PARP, it's only one process. Every product goes through it. We produced in discovery 50 different PARPs, which are these economic risk and risk-mitigant analyses of every ING subsidiary company product. And this peak product had to go through that same process. There isn't a different PARP. There's only one PARP. And that's not Mr. Britton. Mr. Britton's a salesperson. He's the president of the company, but he's still a salesperson. And this insurance product, as you can tell from the record, is particularly complex. It's an arbitrage product where trading on interest rates makes or breaks whether this product is even going to remain in place for any period of time, which is why, particularly in this case, enterprise risk management review was undertaken and necessary, as it is with every other SLD, Reliostar, which is another wholly-owned subsidiary company of ING, and other ING subsidiary products are tested under. So there wasn't a disputed issue of fact about whether there was one PARP or two PARPs. The undisputed record evidence is that there is a process that all of these products go through. This product didn't pass that process, and it's undisputed. At what point did it get stopped? This is the peak product, right? This is the peak product. Yeah, and at some point, someone said this isn't going to work or the figures don't add up, and so that ended that. Is that what precipitated the whole cancellation? The chronology was this. The JCA was signed on June 7th of 2011. It was signed with conditions precedent that included PARP. It was signed because LPI was out looking for financing, premium financing, so that these policies could be purchased because, as this panel knows, the insured is to pay no money for premiums. Who would have borrowed money? That's right. But LPI was to arrange for financing of the premium payments that would be required for a qualified applicant. In early July, Richard Lau, who is the lower-level enterprise risk management person who reports to Prakash Shimpy, issued a memorandum indicating that he would not recommend peak for approval except if certain conditions were met. There was a double negative in his memo, so he issued a clarifying memo indicating that he would not recommend for approval. Lau only has the ability to recommend to approve or not to approve to Prakash Shimpy, the top-level risk officer. Shimpy reviewed. He's with ING. He's with ING, but he has a title with SLD as well. The risk function carries throughout the organization, and there's evidence in the record of our expert witness who testified about the necessity and robustness of SLD's and ING's risk management review process. In any case, Shimpy got Lau's memorandum, and on August 22, 2011 issued his own memorandum indicating that he concurred with the recommendation not to approve. He exercised his experience, qualifications, and training, his business judgment, if you will, to decide that the mitigants available against the risks that this product posed were not sufficient for him to approve it. And he has the final say within the risk structure. The reason that there was a delay, if you will, between August 2011 and October of 2011 is because Butch Britton, and this is where Britton made the statement that Your Honor referred to, the decision was done, there would be no peak, but Britton wanted to make an appeal to the highest level officers within ING U.S. and make his case for why he thought peak would be an acceptable product and the mitigants against the risks were sufficient. In the OCEO, and this was not part of the contract, there was no obligation on the part of Britton or SLD to go to the office of the CEO of ING, but he went seeking an exception by the end of September. The OCEO agreed with the top level risk officer in the organization, would not grant an exception, and SLD thereafter terminated the contract precisely consistent with Section 8i. And I should note it processed all applications, which is really the protection that LPI negotiated for and had under this agreement. There's no argument in this case that LPI was not paid premiums on the products that issued to the applicants who applied for products other than peak. No applicants could apply for peak because peak was simply not available. So LPI, in fact, got everything that it bargained for. Thank you. I take it there's a light on? Yes, Your Honor. Yes. Do you have any more time? Mr. Novak is coming up for rebuttal. Thank you. Your Honors, there's certainly a lot of evidence both ways on this PARP versus PRAP, et cetera. Was it approved? Was it not? We think it's clear that it was approved, that there's at least an issue of fact. But the one thing we know for sure is that the contract said that the approval process that needed to be obtained was SLDs, the companies. Company is defined on page 1 as SLD. Everything you just heard and everything they've been arguing below, and again in their briefs here, is that ING did not complete its approval process. And that's not permitted under the contract. We only had to meet the hurdle of SLD. We got the approval from SLD. Mr. Britton, the president of SLD, saw that those three conditions were satisfied. He then signed on the same day the pricing memo and the JCA. That's it. That was the approval. But is it true that his signature alone doesn't cut it? Well, you know, Judge, we don't know that. The form does have places for other signatures, and we haven't yet uncovered whether those are requirements that are always enforced or not enforced. We do know that Mr. Britton, under oath, said that he signed. He's the highest-ranking officer at SLD. And SLD, again, I'm repeating myself, but SLD is the entity that had to approve the policy, not ING. There's at least an issue. How can there not be an issue of fact? I'm sorry to ask this as a question. I'll say it declaratively. There are issues of fact on the approval. There are issues of fact with extrinsic evidence. If the court believes the contract is ambiguous, that there's two possible ways to harmonize, frankly, we believe there's only one way, and we believe that one way is that 8I's indefinite language, counsel asks the open-ended question, what does indefinite mean? It means just that, indefinite. But the period of time of indefiniteness doesn't start until the three-year minimum term and commitment is completed. One would have expected that if 8I was truly intended to trump the three-year commitment that was in there, that 1A would have said that it was subject to 8I, or 8I would have said, notwithstanding anything to the contrary, in 1A. Neither of those things is said. It can't be that a provision that was truly intended to mean that the day after the contract was signed, a 22-page single-spaced $300 million contract could be terminated at the will of either party was intended without clarifying that in one way or another, and neither of those sections said that it was subject to, or notwithstanding, the other. I think your time's kind of run here. Let's wrap it up. Thank you, Your Honor. I just want to say one final thing, and that is that counsel clearly acknowledged that 8I, even if under some possible ruling the contract was validly terminated, there's an obligation to complete pending applications. And so at the very least, we have that claim. But in total, we think there are issues of fact here that preclude summary judgment at all. That's what we urge the Court to do. Thank you very much for all your time. Thank you both very much. And, of course, the case will be taken under trial.